# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 18, 2016

## QUINZELL LAWON GRASTY v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Hamilton County
### No. 289910   Don W. Poole, Judge

_____

### No. E2015-02075-CCA-R3-PC – Filed February 17, 2017

_____

Petitioner, Quinzell Lawon Grasty, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief.  On appeal, he contends that trial counsel was ineffective for: (1) failing to challenge his first statement to police on the basis that he had requested counsel; (2) failing to file a pretrial motion in limine to exclude references to gang activity; (3) failing to object to the State's use of demonstrative evidence; (4) failing to object to the chain of custody of a backpack; (5)  failing to request the trial court to question jurors about a newspaper found in the jury box; and (6) failing to disclose that he had a conflict of interest with Petitioner's stepfather.  Petitioner also argues that appellate counsel was ineffective for failing to include a copy of the suppression hearing transcript in the record on appeal and failing to raise sufficiency of the evidence as an issue on appeal.  We affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Brandy Spurgin, Chattanooga, Tennessee, for the appellant, Quinzell Lawon Grasty.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; M. Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

*Background*

Petitioner was convicted of first degree felony murder, second degree murder, attempted especially aggravated robbery, and aggravated burglary and was sentenced to life. This Court affirmed the convictions and sentence. *State v. Quinzell Grasty*, No. E2012-00141-CCA-R3-CD, 2013 WL 1458660 (Tenn. Crim. App. Apr. 10, 2013), *perm. app. denied* (Tenn. Sept. 16, 2013).

The following facts were set forth by this Court on direct appeal:

This case concerns the April 16, 2009, shooting death of Steven Matthew Coyle during a home invasion burglary and attempted robbery. A Hamilton County grand jury indicted appellant and a co-defendant for first degree murder, felony murder, attempted especially aggravated robbery, and aggravated burglary. The trial court severed the trials of appellant and his co-defendant and held appellant's trial from October 5 through 8, 2009.

At appellant's trial, Chattanooga Police Officer Annette Butler testified that on April 16, 2009, she was dispatched to a residence on Standifer Gap Road in response to a shooting. When she arrived at the location, a man directed her to the victim's bedroom. Officer Butler found the victim lying on the floor and a female kneeling beside him. Officer Butler checked the victim's pulse and determined that he was deceased. Over appellant's objection, the State introduced photographs of the deceased victim as Officer Butler found him. Officer Butler testified that the back door of the residence had been "kicked in."

Sarah Gill testified that she had been dating the victim for six to eight months prior to his death. She had been living with him at the Standifer Gap residence since December 2008, along with his roommate, Samuel Eldridge; Mr. Eldridge's son; and occasionally Mr. Eldridge's fiancée. Ms. Gill testified that she and the victim were awakened by a "crashing sound" on April 16, 2009. She thought something had fallen, but the victim believed "it was somebody breaking in." The victim got out of bed, picked up a pocket knife, and approached the bedroom door. As he started to open the door, Ms. Gill "heard [a shot] and saw blood." At first she thought someone was playing a joke on them, but when she saw the victim's wound, she called 9-1-1 from her cellular telephone. The State played the recording of Ms. Gill's 9-1-1 call for the jury. Ms. Gill called Mr. Eldridge from another telephone while she spoke with the 9-

1-1 operator, and he arrived shortly before the police. Ms. Gill testified that she learned shortly after moving in that Mr. Eldridge sold hydrocodone and marijuana from the residence. She knew that he had several guns in the house.

Samuel Eldridge testified that he received a telephone call from Ms. Gill at 9:16 a.m. on April 16, 2009, while he was at work. He immediately went home and went straight to the victim's bedroom. Mr. Eldridge found the victim lying on the floor next to his bed. He testified that the victim was already deceased. Mr. Eldridge talked to the 9-1-1 operator. He testified that he "was emotionally disturbed" during that conversation. The police arrived at the house thirty-five to forty seconds after he arrived. Mr. Eldridge testified that he had never seen appellant prior to the trial. He said that the Sunday before the victim's murder, he sold marijuana to a person named Mark at the Standifer Gap residence. Mr. Eldridge said that he had two handguns and an SKS rifle and that Mark saw the SKS rifle.

On cross-examination, Mr. Eldridge agreed that he had told the police a person named Thaddeus Watson, who had robbed him in the past, might have been responsible. He said that the police did not find any drugs at the residence and that he did not try to arrive before the police to hide his drugs. Mr. Eldridge agreed that he was not prosecuted on drug or weapons charges after the victim's death.

Cordarious Holloway testified that in April 2009, Trammel Poindexter, a friend of his since eighth grade, called him for a ride one day. Mr. Poindexter also asked him to pick up appellant, "Mike," and a third individual. Mr. Holloway did not know appellant prior to that day. Mr. Poindexter and the other men gave Mr. Holloway directions to an area near the Rainbow Creek apartment complex. He recalled that they drove past a particular house three to four times because either his passengers did not know where they were going or he missed the directions because he was sending text messages while driving. Mr. Holloway parked at the Rainbow Creek apartments and told his passengers that they "need [ed] to find out what [they were] going to do." Someone exited the vehicle and came back while he was parked, but Mr. Holloway did not know which passenger. The other men told Mr. Holloway to drive back down the street. He complied, and they asked him to turn around because they "passed it again." Mr. Holloway pulled over, and he told Mr. Poindexter to drive his car and take care of whatever they were planning to do while he walked to a place to use the restroom. Mr. Poindexter and the other passengers drove away, and Mr. Holloway walked down the street.

- 3 -

Eventually, Mr. Poindexter and the others returned to pick him up. Mr. Poindexter continued to drive the car, and he took Mr. Holloway home. Mr. Holloway did not notice anything different about the demeanor of any of the passengers during the drive, including appellant. He said that he did not "hear any conversation about hitting a lick or a robbery."

Mr. Holloway testified that later that day, he heard about a murder near Rainbow Creek on the news. He had also heard "that some stuff was on the street said [sic] about me being out there at that time." Mr. Holloway approached a police officer at a McDonald's restaurant to tell him that he had been in the area of the murder earlier in the day. The officer had him talk with a detective. Mr. Holloway talked with one detective and then talked with Detective James Holloway. At the behest of the police, Mr. Holloway called Mr. Poindexter to ask whether Mr. Poindexter and the others had done anything while he was not with them. Mr. Holloway also talked to Mr. Poindexter in person while wearing a recording device.

Jonathan Mance, a former Chattanooga Police officer with the crime scene office, testified that on April 27, 2009, he collected DNA samples using buccal swabs from appellant, Cordarious Holloway, Trammel Poindexter, Michael Adams, and Avery Davis.

Chattanooga Police Detective James Holloway testified that he was the lead investigator for the Coyle homicide. He responded to the crime scene on April 16, 2009. As he walked through the scene, he observed that the rear door appeared to have been forced open. He observed the victim "[l]ying in the floor just inside the doorway of his bedroom." Detective Holloway also interviewed Sarah Gill and Samuel Eldridge and canvassed the neighborhood for leads.

At approximately 7:30 p.m. on April 16th, Detective Holloway "received a phone call . . . from the police dispatch, stating that an Officer Tyrone Williams requested [he] call him." He called Officer Williams, who told him that Cordarious Holloway had approached him and said "that he [thought] he may have transported the suspects out to the scene." Detective Holloway asked Investigator Carl Fields to go talk to Cordarious Holloway and Officer Williams. Eventually, Detective Holloway met Cordarious Holloway at the police service center and interviewed him at approximately 10:00 p.m. Cordarious Holloway gave Detective Holloway names and nicknames of the people who might have been involved in the victim's death.

- 4 -

The police recorded telephone conversations between Cordarious Holloway and Trammel Poindexter, but they did not "get any viable information" from those conversations. On April 27, 2009, the police placed a recording device on Cordarious Holloway and had him speak to Mr. Poindexter in person. Based on that conversation, Detective Holloway developed appellant as a suspect. The same day, Detective Holloway asked the police department's fugitive unit to bring Trammel Poindexter, appellant, and Michael Adams to the police service center. Detective Holloway began interviewing Trammel Poindexter at 6:59 p.m. He interviewed Michael Adams at 8:18 p.m.

According to Detective Holloway, the fugitive unit located appellant at approximately "19:26 or 19:30 on the 27th." The fugitive unit brought appellant to the police service center. Detective Holloway informed appellant of his rights, and appellant waived his rights and agreed to speak with him. During the trial, the State played an audio recording of appellant's statement to police. After telling several different versions of events, appellant told Detective Holloway that several weeks before the murder, a white man named "Mark" told him about a person named "Sam," who would be a good target to rob because he had lots of drugs, money, and guns. On April 16th, appellant suggested to Trammel Poindexter, Michael Adams, and others that they should burglarize Sam's house. They all rode together in a small, white car to Sam's house. Michael Adams kicked in the back door. Appellant had a sawed-off shotgun that had been stored in a black backpack. He described the shotgun as having one barrel and as being sixteen to eighteen inches in length. He also described how the shotgun opened. Appellant said that he was checking to see if anyone was in the child's bedroom when the victim opened a door behind him. Appellant "was just turning around, . . . and the gun went off." He said that he did not "mean to kill the man" and that he wished he could tell the family that he was sorry. Appellant said that he did not know what happened to the gun.

On May 6, 2009, appellant contacted Detective Holloway through the correctional center's employees. Detective Holloway had appellant brought to the police service center and interviewed him again after appellant signed a second rights waiver form. The State also played an audio recording of appellant's second statement. In his statement, appellant said that he had heard that the others involved were planning to let him take all of the blame. He told Detective Holloway that Michael Adams shot the victim. Michael Adams was under house arrest at the time, so he asked appellant to "take the charge" for him. Appellant said that he had been in a gang but had "dropped [his] flag" because the other

- 5 -

gang members had not supported him after he was arrested. He also said that he had been threatened by various people because he told the police that Michael Adams was involved in the burglary.

On cross-examination, Detective Holloway testified that he asked the fugitive unit to bring appellant to the police service center because Trammel Poindexter named appellant as the shooter during Poindexter's conversation with Cordarious Holloway. When Detective Holloway interviewed Mr. Poindexter, he identified appellant as one of the individuals "who entered the residence and who had subsequently talked about the shooting and that he had done the shooting." Detective Holloway agreed that the police discovered a mixture of three different DNA profiles on a backpack found at the crime scene, and neither Trammel Poindexter nor appellant could be excluded as contributors of the DNA.

Chattanooga Police Officer Brian Russell of the crime scene unit testified that he participated in the initial walk-through of the crime scene at 7616 Standifer Gap Road on April 16, 2009. He recalled seeing a black backpack in the living room, but no one collected it. On May 7, 2009, Samuel Eldridge's mother brought the backpack to the police service center because she found it while cleaning the residence and did not know to whom it belonged.

Chattanooga Police Investigator Greg Mardis testified that he responded to the crime scene at 7616 Standifer Gap Road on April 16, 2009. He identified photographs of the crime scene and noted the location of shotgun wadding and a pocketknife in relation to the victim. He collected the shotgun wadding and pocketknife as evidence.

The trial court accepted Tennessee Bureau of Investigation ("TBI") Agent Mark Dunlap as an expert in DNA and serology. Agent Dunlap tested six areas of the black backpack provided to him by the Chattanooga Police Department for DNA. He found DNA from at least four individuals and concluded that Trammel Poindexter and appellant could not be excluded as contributors. On cross-examination, Agent Dunlap testified that Michael Adams and Cordarious Holloway could be excluded as contributors to the DNA on the backpack.

The trial court accepted TBI Agent Steven Scott as an expert in firearms. The Chattanooga Police Department sent him shot shell wadding in association with this case, and he concluded that the wadding was consistent with a twelve-gauge, Winchester AA type wadding. Agent

Scott also received "[eighteen] fired lead birdshot pellets" that he determined to be "number seven and a half birdshot" based on "size and weight specifications." Agent Scott explained that when pellets leave a shotgun, "they are together in one mass." From a twelve-gauge shotgun, the pellets begin to spread into a cone-shaped pattern after traveling five to seven feet from the muzzle of the gun. For demonstration purposes, Agent Scott produced a shotgun from the TBI collection that he had modified based on appellant's description given during his first statement to the police. He explained that the hammer would have to be cocked on the weapon to allow a person to pull the trigger. Agent Scott demonstrated for the jury that the sawed-off shotgun could be placed inside the black backpack previously entered as an exhibit.

Dr. James Kenneth Metcalfe, a pathologist at the Hamilton County Medical Examiner's Office, testified that the victim died from a gunshot wound to the head. He described the wound as having "a central cluster in which [there was] a hole and then some small holes around the margin on the skin." He estimated that there were 230 pellets inside the victim's skull. Dr. Metcalfe removed eighteen pellets as a sample. He opined that no medical intervention would have prevented the victim from dying.

*Grasty*, 2013 WL 1458660, at *1-5.

*Post conviction Hearing*

Appellate counsel testified that she began representing Petitioner at some point while his motion for new trial was pending. She later filed an appellate brief in the Court of Criminal Appeals. Appellate counsel testified that Petitioner, his step-father, and trial counsel had a "falling out," and Petitioner was briefly represented by another attorney who had filed the motion for new trial. Appellate counsel recalled meeting with Petitioner while he was still incarcerated in the local jail, and she had "numerous conversations" with Petitioner and his family.

Appellate counsel testified that sufficiency of the evidence was raised in the motion for new trial. However, she did not raise the issue in the appellate brief. Appellate counsel testified that it was her practice to review every issue raised in the motion for new trial and then "hone" the issues down to those that she thought might entitle Petitioner to relief. She testified that there was also an issue concerning a newspaper, featuring a color picture and story about Petitioner's case, which was purported to have been found in the jury box after the verdict. However, a bailiff testified that the newspaper belonged to him and had fallen off the counter. Appellate counsel testified that the issue was not significant to her, and she had reviewed all transcripts concerning the matter. She also noted that there had been a request for an investigator to

- 7 -

interview the jurors. Appellate counsel felt that the issue was not strong because there was no indication that the jurors saw the paper, "[i]n fact, just the opposite." She noted that she did not interview any of the jurors. Appellate counsel also believed that the juror issues would be more of a post-conviction issue because "it's pretty hard to [interview jurors] in the context of the motion for new trial."

Appellate counsel testified that on appeal, she argued that there was error concerning Petitioner's motion to suppress. She said that she received transcripts of the suppression hearings from the court reporter and as a rule in all of her cases, did not check-out the appellate record. Therefore, she was unaware that the clerk's office did not include the transcript in the record on appeal. However, appellate counsel testified that the Court of Criminal Appeals addressed the issue without the transcript.

Appellate counsel testified that she did not challenge the suppression issue based on violations of the Fifth and Sixth Amendments because that claim had not been raised in the trial court and that trial counsel argued other grounds for challenging the statements. She said that she would have argued that there was a *Miranda* violation because Petitioner had initially requested an attorney, and he had unknowingly been appointed an attorney by the time of the second interview.

Concerning the backpack issue, appellate counsel testified that trial counsel had conceded the chain of custody at trial. Therefore, appellate counsel did not believe that she could raise the issue on appeal. She noted that the backpack had been found after the shooting during clean-up by the victim's family members. The item, which contained multiple sources of DNA, was sent to the Tennessee Bureau of Investigation (TBI) for testing. The results of the testing revealed that Petitioner along with Trammel Poindexter could not be excluded as contributors of the DNA.

Quita Johnson, Petitioner's mother, testified that Petitioner called her at approximately 5:30 p.m. on April 28, 2009, and told her that police were at their residence to arrest him. Petitioner was eighteen-years old at the time and babysitting his younger brother. Ms. Johnson testified that Petitioner completed the ninth grade in school and could read and write. He had no prior involvement with police. Ms. Johnson testified that she later heard from Petitioner after 2:00 a.m., and he informed her that he was being charged with murder. She learned two weeks before trial that Petitioner had an attorney, and she learned the day before trial that he had given a second statement to police. Ms. Johnson testified that trial counsel would not speak with her other than to tell her the week before trial that Petitioner needed clothes, a haircut, and other items for the trial.

On cross-examination, Ms. Johnson testified that as a juvenile, Petitioner had an incident at school involving indecent exposure. He was sent to school in Memphis for a year where he received counseling. Ms. Johnson testified that Petitioner lived with her

uncle in South Carolina for a period of time. She said that he quit school while in the tenth grade, and he moved back to Chattanooga.

Ralph Williams testified that he was previously married to Petitioner's mother, and he had known Petitioner since Petitioner was one-year old. Mr. Williams said that Petitioner's trial counsel had been appointed to represent Mr. Williams in a juvenile court matter in 2005. Mr. Williams testified that during their first meeting, trial counsel did not want to hear anything that Mr. Williams had to say, and trial counsel threatened to have Mr. Williams sent for a mental evaluation. Mr. Williams filed a complaint against trial counsel, and new counsel was appointed to represent Mr. Williams.

Mr. Williams testified that when he learned trial counsel was representing Petitioner, he told Petitioner about his prior experience with trial counsel. He said that Petitioner told him things about Petitioner's case, and Petitioner wanted Mr. Williams to write letters to the trial judge to have trial counsel removed from the case. Mr. Williams testified that he wrote letters on Petitioner's behalf, and he also heard that trial counsel and the trial court were having ex parte conversations about Petitioner's case. Mr. Williams testified that Petitioner filed motions to have trial counsel, appellate counsel, and the trial judge disqualified; however, the motions were denied. Mr. Williams was not present on the last day of trial when the newspaper was discovered, but he saw a copy of the newspaper at a hearing on the matter. Trial counsel testified at the post-trial hearing.

Trial counsel testified that he had practiced law for fifteen years and was appointed to represent Petitioner "a few years ago." He said that Petitioner gave two statements to police, and trial counsel filed a motion to suppress the first one contending that Petitioner was unconstitutionally in police custody when he gave the statement. He said: "My main focus was how they took and what I believe they took him without probable cause from his residence to the police station and then questioned him where he gave that damning statement." Trial counsel testified that he was unaware that Petitioner had been appointed counsel at the time Petitioner gave the second statement on May 6, 2009. He did not recall if any of the paperwork that he had been provided contained that information. Concerning the suppression hearing, trial counsel testified:

> I had brought up [sic] *Dunaway v. New York* aspect to that statement where in the Dunaway hearing where the U.S. Supreme Court back in '79 ruled that a person can be brought to a police station in one of two ways. One was under arrest and the other was voluntarily. And that any statement that was derived absent that would be suppressed even if there had been proper *Miranda* warnings.

Trial counsel said that he did not argue the suppression motion based on a *Miranda* violation because he did not see one. He testified that the issue was whether Petitioner's request for counsel was equivocal or unequivocal. Trial counsel said that during the first

- 9 -

statement, Petitioner gave an equivocal request for counsel but eventually said, "Okay. I don't need a lawyer." The trial court denied Petitioner's motion to suppress. Trial counsel testified that he did not file a motion to suppress Petitioner's second statement because Petitioner had asked to speak with law enforcement. He thought that the motion would have been "frivolous."

Trial counsel thought that prior to trial, he had a conversation with the State about a shotgun that they wanted to use at trial that was similar to the one used to kill the victim. He did not recall a meeting about the evidence and deferred to whatever the transcript said about the matter. Trial counsel testified that he saw no chain of custody issue concerning a backpack that was found weeks after the shooting by the victim's family. Both Petitioner and Trammel Poindexter could not be excluded as contributors of DNA found on the backpack. Concerning chain of custody, trial counsel testified:

> Because the chain of custody on any suppression motions only deal with Fourth Amendment issues which only involves rights against actions of the State. Here these were private citizens. There's no state concert theory, there was no public function theory for me to bring that in. These folks acted individually and on their own turned it over to law enforcement. The chain of custody then becomes applicable under the Supreme Court doctrine from the time it goes into State hands. There wasn't a seizure issue. Wherever it came from goes to the weight of the evidence and the credibility of the weight of that evidence at trial.
>
> \*      \*      \*
>
> Again, you have a public - - private person turning documents over or things over to the State. At that time the chain begins. I had no valid reason to file a motion to attack that. It would have been frivolous and I'm not going to do that.

Trial counsel further noted that he stipulated to the chain of custody at trial. He said, "Because I had looked at that particular issue and the chain of custody was unbroken at the time - - from the time the police got it to the time it was offered at trial."

Concerning the newspaper, trial counsel testified that his assistant pointed it out to him after the verdict, and he retrieved it from the jury box. He said that it was "folded in between the last seat and the next to last seat." The jurors had already left. Trial counsel testified that there was a picture of Petitioner, and "it was talking about the previous testimony." Trial counsel raised the issue in the motion for new trial and testified about it, as did Bob Ball, a bailiff who claimed that the newspaper belonged to him.

Trial counsel testified that Petitioner listened to his step-father, Mr. Williams, rather than trial counsel. He said that Mr. Williams "filed complaints, filed stuff with the Court, filed stuff to the Obama administration." He also said that Mr. Williams was such an "interference" in the case that trial counsel eventually withdrew from representing Petitioner on January 3, 2010, before the motion for new trial was filed. He did not recall how many times that he met with Petitioner, and he noted that Petitioner did not want to see him sometimes. Trial counsel noted that Petitioner gave his second statement to police based on Mr. Williams' advice.

Petitioner testified that he was eighteen years old at the time of his arrest on April 28, 2009. He had completed the ninth grade, and he could read and write pretty well. Petitioner testified that he did not understand the *Miranda* waiver form and that he signed it because he thought he had to do so. Petitioner testified that he requested an attorney during the first interview. He said, "I asked them can I have a lawyer because I was told that - - by somebody that you can ask for a lawyer if anybody talking to you or whatever. And I asked them for a lawyer." Petitioner testified that the detective was still talking to him, and Petitioner said that he again asked for an attorney. He said that the detective then informed him that he could no longer talk to Petitioner. Petitioner testified, "He was kind of refusing, but I said it again that I wanted a lawyer, but I went ahead and talked to him because he said he could help me." Petitioner then gave a recorded statement that was introduced at trial.

Petitioner testified that he spoke with police again on May 6, 2009. He had asked Sergeant Smith who worked at the jail to see if an attorney had been appointed to represent him. He said that he also told her "if not, I can talk to the police and they might be able to help me with that; so I agreed to it." Petitioner testified that Sergeant Smith later informed him that she called detectives and was waiting for them to call her back. He thought that she had checked with the magistrate's office to see if he had an attorney. Petitioner testified that he learned the day before his first court date that counsel had been appointed. He did not tell counsel that he had spoken with police a second time. Petitioner later learned that counsel had been appointed on May 4, 2009, after the public defender's office withdrew from his case. Petitioner testified that if he had known that counsel had been appointed on May 4, he would not have spoken to police on May 6. He was not sure why he spoke to police the second time other that he wanted to "talk to somebody and clarify certain things." Petitioner agreed that his second statement was "totally" different than the first because he explained to police that he did not commit the offenses. Petitioner denied that his step-father had any involvement in his second statement to police.

Concerning the newspaper, Petitioner testified that two to three minutes after the verdict and after the jury had been released, someone whispered to trial counsel, and trial counsel walked over to the jury box, retrieved the newspaper, and handed it to the trial judge. Petitioner testified that the newspaper was folded with his picture on one side and

- 11 -

the story about his case on the other. He did not see the newspaper prior to that time. Petitioner testified that trial counsel came to see him a total of "five times, if that." He was aware of some issues between trial counsel and Petitioner's step-father, and he discussed the matter with trial counsel. Petitioner testified that he also filed a motion to disqualify trial counsel. At the hearing on the motion, Petitioner said that the trial counsel told him "that if I wanted to get somebody else then more than likely they're not going to help me like he could and that I would probably end up with life; so I decided to keep him." Petitioner then told the court at the motion hearing that he and trial counsel had worked things out and could get along.

Petitioner testified that he did not speak to trial counsel prior to the suppression hearing. He said that trial counsel "brought it up once, but he didn't just press any issues on it." Petitioner testified that the suppression motion was "based off of probable cause." He did not ask trial counsel to argue that there was a *Miranda* violation because Petitioner "didn't know anything about any of that; so I just thought he knew what he was talking about." Petitioner testified that he and trial counsel discussed the backpack that was found three weeks after his arrest. He said that trial counsel indicated that he "would argue chain of custody."

Petitioner testified that he was briefly represented by another attorney after trial and before appellate counsel was appointed. Petitioner talked to the attorney who had asked the trial court for time to contact jurors and conduct an investigation concerning the newspaper incident. Petitioner testified that the attorney told him that he was unable to make contact with all of the jurors, and "nothing came out of" his discussions with the jurors he contacted. Petitioner said that he met with appellate counsel "like, twice at the county." He wanted her to address the newspaper issue and several other suppression issues in the motion for new trial and on appeal. Petitioner testified that appellate counsel sent him a copy of the brief after it was filed, and he realized there were issues not addressed in the brief that he wanted raised. He said that appellate counsel did not raise an issue about the backpack or sufficiency of the evidence. Petitioner wanted to challenge the sufficiency of the evidence because he felt that the State did not prove the intent of the underlying felony of aggravated burglary.

On cross-examination, Petitioner testified that he initialed each specific provision of the waiver of rights form on April 27, 2009, and he signed the bottom. He also said that Detectives Holloway and Tate read the form to him. However, Petitioner claimed that he had no idea what was going on, and he did not understand any of his rights. He thought that was "just what they[the officers] do." When asked how he knew to request an attorney, Petitioner said: "Because I remember - - after the way they kept talking to me I remember a guy telling me something about any time you don't feel comfortable talking to anybody just ask for a lawyer." Petitioner never told trial counsel that he did not understand his rights.

Petitioner testified that after signing the waiver of rights form, he agreed to talk to the detectives, and he gave a lengthy statement. In the statement, Petitioner admitted to going to the Rainbow Creek Apartments with some other people to steal money and drugs. He further admitted to shooting and killing the victim. Petitioner admitted that he got emotional during the statement and began to cry but he was not sure why. He said that he tried to "take the charge and at the same time be sympathetic to the family because I should have [sic] went." At the post-conviction hearing Petitioner denied that he shot and killed the victim.

Concerning his second statement, Petitioner testified:

> Like I said, I was having - - I was angry about not going to court and I was talking to the CO. She was supposed to bring me downstairs to talk to somebody from mental health and - - from Fortwood, and I asked her to see if I had an attorney. That's who I originally wanted to talk to. And she said she would check with the public defender's office and see. If not, then I could talk to the detective and maybe they'll know something.

Petitioner testified the corrections officer, Sergeant Wanda Smith, later told him that she had no information about whether he "had an attorney, and she had called the detectives and she didn't get an answer and she was waiting on them to call back." Petitioner testified that a police officer arrived and picked him up from the county jail and transported him to the police service center. There he met with Detectives Holloway and Tate, and he signed a second waiver of rights form. Defendant then gave a recorded second statement indicating that Michael Adams shot the victim. The recording of the second statement was played for the jury at trial.

Lorrie Miller testified that she was appointed on May 4, 2009, to represent Petitioner at the preliminary hearing. She did not recall the first time that she met with Petitioner after her appointment, and she did not recall if he was in court during the first hearing on May 6, 2009. Ms. Miller testified that she first became aware of Petitioner's second statement to police during the preliminary hearing on May 20, 2009. She also did not know that the statement was made two days after she had been appointed to represent Petitioner.

Wanda Smith testified that she was employed as a sergeant by the Hamilton County Jail in May of 2009. She recalled Petitioner being very emotional and distraught not long after he was incarcerated at the jail. She said that they "called the Crises and they came and talked to [Petitioner]." Ms. Smith testified that Petitioner also asked to "talk to someone and I remember calling - - a detective or someone came and talked to him and then the detective asked me to write a report as to what went on when he talked to me." She did not recall telling Petitioner that before talking to detectives she would

- 13 -

check with the magistrate's office to see if Petitioner had been appointed counsel. Ms. Smith testified that she later resigned her position at the jail due to her theft of an inmate's food stamp card that she unlawfully used.

On cross-examination, Ms. Smith testified that Petitioner specifically asked to speak with a detective or investigator. Based on Petitioner's request, she attempted to get in touch with a detective. Ms. Smith testified that detectives later spoke with Petitioner, and they asked her to write a report. She said that Petitioner told her that he was sorry about what he had done. Ms. Smith further testified:

> He said that he was coaxed into going with some guys, they were going to do a drug bust, a drug raid on a house, nobody was supposed to be at home. And if I'm not mistaken, he was still a juvenile or he wasn't - - I'm not sure.

Petitioner also told her that the others made him carry the gun and that "nobody was supposed to be there and a guy showed up and it surprised him and scared him and the gun went off." Ms. Smith testified that Petitioner also spent a lot of time on suicide watch.

*Analysis*

In a post-conviction proceeding, the burden is on the Petitioner to prove his facts for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id*. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 457.

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 205, 280 L. Ed. 2d 674 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

- 14 -

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Id*. at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 370 (quoting *Strickland*, 466 U.S. at 694). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn.1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S.Ct. at 2066.

I.      *Failure to Challenge Petitioner's First Statement to Police on the Basis that Petitioner had Requested Counsel.*

Petitioner argues that trial counsel was ineffective for failing to challenge his first statement to police because he had invoked his right to counsel. Concerning this issue, the post-conviction court found:

> The transcript of the first statement reflects that, after listening to a recitation of his rights and a waiver of rights, the petitioner unhesitatingly waived his rights:
>
> > Q      Do you understand that? You ready to talk to us?
> >
> > A      I can talk, I just, know what I'm saying, you ask me the questions.
> >
> > Q      That will work, just sign right there . . . .
>
> Transcript of 27 April 2009 Recorded Statement, p.35. The transcript of the first statement also reflects that, after denying involvement in the murder and before confessing, the petitioner made a few ambiguous requests for a lawyer before, on clarification, withdrawing any request:
>
> > A      Can I have a lawyer but I tell you exactly what happened, though, know what I'm saying?

Q      Well, which is it, you want a lawyer or you want to tell me what happened?

A      I want a lawyer, but I want to, know what I'm saying, just make sure he just understand [sic].  But, you know what I'm saying, I heard about the murder.  I wasn't there, I didn't pull the trigger, none of that, you feel me, you know what I'm saying.  I know who was there.

Q      Quinzell, let me instruct you one thing [  ], okay?  Two times now you've said can I have a lawyer.  Okay, do you want a lawyer or you want to tell me what you know?

A      This [sic] what I'm trying to say, I can have a lawyer here and I can tell you the truth, know what I'm saying, tell you what happened.  I just want to have a lawyer here just so, know what I'm saying, so he can be here, you feel me.  That's the only reason why I'm saying a lawyer, just he can be here, but I'm saying, what you ask me, what'd you ask me?

Q      Well, what I'm trying to say is if you want to talk to me know without a lawyer, that's fine.  If you want a lawyer, we can't talk to you anymore.

A      I'm saying, okay, I don't need a lawyer, I know about a murder, but I wasn't the one who –

Transcript of 27 April 2009 Recorded Statements, pp. 42-3.  The transcript of the first statement does not reflect that police made threats or inappropriate promises to the petitioner.  The Court therefore finds that any deficiency in counsel's performance with respect to his failure to challenge the admissibility of the first statement on additional grounds was not prejudicial.

At the post-conviction hearing, trial counsel testified he argued that Petitioner was unconstitutionally seized by police when he gave the first statement.  He said:  "My main focus was how they took and what I believe they took him without probable cause from his residence to the police station and then questioned him where he gave that damning statement."  Concerning the suppression hearing, trial counsel testified:

I had brought up [sic] *Dunaway v. New York* aspect to that statement where in the Dunaway hearing where the U.S. Supreme Court back in '79 ruled that a person can be brought to a police station in one of two

- 16 -

ways. One was under arrest and the other was voluntarily. And that any statement that was derived absent that would be suppressed even if there had been proper *Miranda* warnings.

Trial counsel said that he did not argue the suppression motion based on a *Miranda* violation because he did not see one. He testified that the issue was whether Petitioner's request for counsel was equivocal or unequivocal. Trial counsel said that during the first statement, Petitioner gave an equivocal request for counsel but eventually said, "Okay. I don't need a lawyer."

A defendant's statements made during a custodial police interrogation are only admissible if the state established that the defendant was advised of certain constitutional rights, including the right to an attorney and the right to be silent. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed. 2d 694 (1966). Once a suspect subject to custodial interrogation makes an unequivocal request for an attorney, all interrogation must cease unless the suspect initiates conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S,Ct, 1880, 68 L.Ed.2d 378 (1981); *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994).

Petitioner in this case was given proper *Miranda* warnings. Although he indicated that he wanted an attorney, Petitioner then changed his mind and said, "I don't' need a lawyer." Petitioner has not established that there was a violation of his right to counsel or that suppression of his statement on this ground would have occurred. Petitioner has also not shown that trial counsel's failure to seek suppression of his first statement on this ground was deficient or prejudicial.

II.     *Failure to File a Pre-Trial Motion in Limine to Exclude References in Petitioner's Statement to Gang Activity*

Petitioner argues that trial counsel "should have made an argument that any gang related activities should have been excluded pursuant to Rule 404(b) of the Tennessee Rules of Evidence." He also asserts that trial counsel erroneously argued that the evidence should have been excluded under Rule 403 of the Tennessee Rules of Evidence. However, this specific issue was not raised in Petitioner's post-conviction petitions nor did he raise it at the evidentiary hearing. Therefore, it is waived. An issue for review by this court must first be raised in the petition for post-conviction relief or amended petition. Tenn. Sup. Ct. R. 28 § 8(D)(4); *Long v. State,* 510 S.W.2d 83, 85 (Tenn. Crim. App. 1974); *Kevin Allen Gentry v. State*, No. E2013-00791-CCA-R3-PC, 2014 WL 1883701, at \*10 (Tenn. Crim. App. May 12, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014).

We also point out that in his original *pro se* petition Petitioner raised the following: "The trial court erred in failing to redact references to gang involvement in

my statements which were completely irrelevant to the case and were extremely prejudicial to the defendant." This issue was raised on direct appeal, and this Court held:

> For the first time on appeal, appellant argues that under Tennessee Rule of Evidence 404(b), the trial court erred by failing to redact references to gang affiliation from appellant's second statement to police because such references amounted to inadmissible character evidence. At trial, appellant objected to the admission of his second statement under Tennessee Rule of Evidence 403. The trial court specifically told appellant's counsel that he was entitled to a hearing under Rule 404(b), but counsel maintained that he was objecting under Rule 403. Tennessee Rule of Appellate Procedure 36(b) states, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Therefore, appellant has waived his argument that the trial court impermissibly admitted appellant's statement under Rule 404(b). Furthermore, we conclude that the statement was properly admitted under Rule 403 because the appellant's references to his gang affiliation, specifically that he had disassociated himself from his gang, were highly probative of his rationale for recanting his confession and because appellant has not shown that the probative value of the statement was substantially outweighed by the danger of unfair prejudice.

*Grasty*, 2013 1458660, at \*9. Even if counsel was ineffective for failing to move for redaction of any references to gang activity in Petitioner's statement to police, and this issue was properly raised in the post-conviction petition, no prejudice could have been shown because of the analysis of the panel of this court on Petitioner's direct appeal.

III.    *Failure to Object to the State's Use of Demonstrative Evidence*

Petitioner contends that trial counsel's performance was deficient by failing to argue under Tenn. R. Evid. 403 that the trial court improperly allowed the State to use a modified shotgun provided by the Tennessee Bureau of Investigation (TBI) to show that it would fit inside the backpack that contained Petitioner's DNA and was found after the victim's murder.

As pointed out by the State, this issue of the shotgun was raised and addressed on direct appeal. On appeal, this court held:

> Appellant argues that the trial court abused its discretion by allowing TBI Agent Steven Scott to use a shotgun obtained from the TBI's collection and modified by him in a demonstration of how a shotgun is

broken and loaded and how a sawed-off shotgun might be concealed in a backpack.

At trial, the trial court accepted Agent Scott as a firearms expert. He demonstrated to the court how a sawed-off shotgun is used and concealed. He testified that the shotgun came from the TBI collection, and he modified it based on a transcript of appellant's statement. In his statement, appellant agreed with the detective conducting the interview that the shotgun he used was sixteen to eighteen inches in length, and he described how the shotgun opened. He further described it as having one barrel. The trial court found that the shotgun would assist the trier of fact in understanding Agent Scott's testimony. The trial court further found that it was relevant to the elements of intent and premeditation and to show how a weapon could be concealed in a backpack. The trial court admitted the shotgun for demonstrative purposes only and instructed the jury that the shotgun was not used in the shooting and was to be used only for demonstrative purposes. "The admission of demonstrative evidence is within the sound discretion of the trial court." *State v. Douglas Marshall Mathis*, M2002-02291-CCA-R3-CD, 2004 WL 392710, at *10 (Tenn. Crim. App. Mar. 3, 2004) (citations omitted). In our view, the trial court did not abuse its discretion by admitting the shotgun for demonstrative purposes. Furthermore, the trial court's instructions to the jury rendered any error harmless, as jurors are presumed to follow the trial court's instructions. *Id.* (citing Tenn. R. App. P. 36(b); *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994); *State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990)).

This court has held that "demonstrative evidence, including a reenactment of the crime, may be introduced during trial, and the decision to allow a courtroom demonstration as evidence rests within the discretion of the trial court." *State v. Slimick*, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *23 (Tenn. Crim. App. Dec. 17, 2015). Since this court found that there was no error in admitting the shotgun for demonstrative purposes, it cannot be said that trial counsel was ineffective for failing to argue that the evidence was inadmissible pursuant to Tenn. R. Evid. 403. Petitioner has not shown that trial counsel's performance was deficient or that he was prejudiced by any alleged deficiency.

IV.     *Failure to Object to the Chain of Custody of the Backpack*

Petitioner argues that trial counsel was ineffective for stipulating to the chain of custody concerning the backpack that had been found after the shooting during clean-up by the victim's family members. The item, which contained multiple sources of DNA,

was sent to the TBI for testing. The results of the testing revealed that Petitioner along with Trammel Poindexter could not be excluded as contributors of the DNA. He also argues that trial counsel was ineffective for failing to subpoena Gloria Eldridge, the person who found the backpack, to testify about the possibility of contamination when she delivered it to police.

Concerning this issue, the post-conviction court found:

> In the subject amended petition, the petitioner alleges that trial counsel was ineffective in stipulating to chain of custody on all physical evidence, "including a back pack that was not recovered from the crime scene for weeks after the crime scene investigation." There is, however, no evidence of any pre-collection contamination of physical evidence or any post-collection break in the chain of custody of physical evidence, including the backpack. With respect to the backpack specifically, the proof at trial regarding the petitioner's admission to handling it in his first statement, the circumstances of its belated discovery at the scene, and the possible sources of DNA on it, is sufficient to support a finding that it was left there by the perpetrator(s) at the time of the offenses and the DNA evidence inculpating the petitioner was not put there later.

> [On direct appeal the Court of Criminal Appeals observed]:

>> Chattanooga Police Officer Brian Russell of the crime scene unit testified that he participated in the initial walk-through of the crime scene at 7617 Standifer Gap Road on April 16, 2009. He recalled seeing a black backpack in the living room, but no one collected it. On May 7, 2009, Samuel Eldridge's mother brought the backpack to the police service center because she found it while cleaning the residence and did not know to who it belonged.

>> .  .  .

>> The trial court accepted Tennessee Bureau of Investigation ("TBI") Agent Mark Dunlap as an expert in DNA and serology. Agent Dunlap tested six areas of the black backpack provided to him by the Chattanooga Police Department for DNA. He found DNA from at least four individuals and concluded that Trammel Poindexter and appellant could not be excluded as contributors. On cross-examination, Agent Dunlap testified that Michael Adams and

- 20 -

> > Cordarious Holloway could be excluded as contributors to the
> > DNA on the backpack.
>
> *State v. Grasty*, 2013 WL 1458660, *4 (Tenn. Crim. App.), perm. app. denied, (Tenn. 16 Sep.). The [Post-Conviction] Court therefore finds that any deficiency in counsel's performance in this respect was not prejudicial.

Concerning this issue, trial counsel testified at the post-conviction hearing that he saw no chain of custody issue concerning a backpack. As to the chain of custody, trial counsel testified:

> Because the chain of custody on any suppression motions only deal with Fourth Amendment issues which only involves rights against actions of the State. Here these were private citizens. There's no state concert theory, there was no public function theory for me to bring that in. These folks acted individually and on their own turned it over to law enforcement. The chain of custody then becomes applicable under the Supreme Court doctrine from the time it goes into State hands. There wasn't a seizure issue. Wherever it came from goes to the weight of the evidence and the credibility of the weight of that evidence at trial.
>
> \*      \*      \*
>
> Again, you have a public - - private person turning documents over or things over to the State. At that time the chain begins. I had no valid reason to file a motion to attack that. It would have been frivolous and I'm not going to do that.

Trial counsel further noted: "Because I had looked at that particular issue and the chain of custody was unbroken at the time - - from the time the police got it to the time it was offered at trial."

Initially, we find that trial counsel's analysis concerning the chain of custody of the backpack is incorrect. First, chain of custody is not a fourth amendment issue as stated by trial counsel at the post-conviction hearing. Furthermore, chain of custody applies even before "the State" takes possession of an item. Rule 901(a) of the Tennessee Rules of Evidence requires that evidence be authenticated or identified as a condition precedent to its admissibility. Before tangible evidence may be introduced, the party offering the evidence must either call a witness who is able to identify the evidence or must establish an unbroken chain of custody. *State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). However, "[t]he identity of tangible evidence need not be proven beyond all possibility of doubt, and all possibility of

tampering need not be excluded." *Id.* Rather, "[i]t is sufficient if the facts establish a reasonable assurance of the identity of the evidence." *State v. Woods*, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). "Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion." *Holloman*, 835 S.W.2d at 46. Each person who has control or custody of the evidence "between the time it is collected and the time it is either introduced into evidence or subjected to scientific analysis" is a "link" in the chain of custody. Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[13][c](5th ed. 2005); *State v. John M. Banks*, No. M2008-00044-CCA-R3-CD, 2009 WL 2447672, at *10 (Tenn. Crim. App. Aug. 11, 2009). In *State v. Bolen*, 544 S.W.2d 918 (Tenn. Crim. App. 1976), a panel of this court held that a packing slip found in a dumpster was erroneously introduced. This court held: "The witness who found it should have either identified it, or an unbroken custody chain established, as a condition precedent to the introduction." There is no requirement that the evidence be in "State hands" before the chain of custody begins.

In any event, Petitioner presented no evidence at the post-conviction hearing to undermine the chain of custody of the backpack. He argues that trial counsel should have called Gloria Eldridge, the person who found the backpack, to testify concerning the possibility of contamination prior to her delivering it police. However, Petitioner did not call Ms. Eldridge to testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit these witnesses might have offered to Petitioner's case. *Id.* Accordingly, Petitioner has failed to demonstrate prejudice in this regard.

*V.     Failure to Request the Trial Court to Question Jurors About a Newspaper Found Near the Jury Box After Trial.*

Petitioner contends that trial counsel was ineffective for failing to request that the trial court question the jurors about a newspaper that was found in the jury box after the verdict was rendered and the jurors had been released. The newspaper contained an article about Petitioner's case which Petitioner contends was "emotional and inflammatory." The State points out that this issue does not appear to have been raised in Petitioner's post-conviction petition or in any of the amended petitions. However, the issue was raised in a memorandum "to supplement his argument requesting post-conviction relief," and the issue was raised at the post-conviction hearing.

Although the post-conviction court did not address this specific claim, we find that Petitioner has not demonstrated any prejudice concerning this issue. Appellate counsel testified at the post-conviction hearing that a bailiff indicated at the motion for new trial that the newspaper containing the article about Petitioner's case belonged to the bailiff.

At the hearing on the motion for new trial, the bailiff also testified that he believed that the newspaper was in a sack at the time that it was found rather than on the floor. Appellate counsel testified that the issue was not significant to her, and she had reviewed all transcripts concerning the matter. She also noted that there had been a request for an investigator to interview the jurors. Appellate counsel felt that the issue was not strong because there was no indication that the jurors saw the paper, "[i]n fact, just the opposite." Trial counsel testified at the post-conviction hearing that after the jury returned its verdict, his assistant pointed the newspaper out to him, and he retrieved it from the jury box. He said that the newspaper was "folded in between the last seat and the next to last seat." The jurors had already been dismissed at that time. Trial counsel testified that there was a picture of Petitioner in the paper, and the accompanying article "was talking about the previous testimony." Trial counsel raised the issue in the motion for new trial, and trial counsel testified about it at the motion hearing, as did Bob Ball, a bailiff who claimed that the newspaper belonged to him. We also point out that Petitioner failed to call the bailiff or any of the jurors concerning the newspaper article, and he did not present the article at the post-conviction hearing. As previously stated, generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black*, 794 S.W.2d at 757. We may not speculate on what benefit these witnesses might have offered to Petitioner's case. *Id.* Petitioner has not shown that trial counsel's performance was deficient or that he was prejudiced by any alleged deficiency.

*VI.    Trial Counsel's Alleged Conflict of Interest with Petitioner's Stepfather.*

Petitioner asserts that trial counsel had a conflict of interest in Petitioner's case because trial counsel had a bad relationship with Petitioner's stepfather, Ralph Williams, during trial counsel's representation of Mr. Williams several years earlier on unrelated charges. Again, the post-conviction court did not make any specific findings concerning this issue. However, the record does not show any conflicts of interest concerning trial counsel's representation.

At the post-conviction hearing, Mr. Williams testified that Petitioner's trial counsel had been appointed to represent Mr. Williams in a juvenile court matter in 2005. Mr. Williams testified that during their first meeting, trial counsel did not want to hear anything that Mr. Williams had to say, and trial counsel threatened to have Mr. Williams sent for a mental evaluation. Mr. Williams filed a complaint against trial counsel, and new counsel was appointed to represent Mr. Williams. Mr. Williams testified that when he learned trial counsel was representing Petitioner, he told Petitioner about his prior experience with trial counsel. He said that Petitioner told him things about Petitioner's case, and Petitioner wanted Mr. Williams to write letters to the trial judge to have trial counsel removed from the case. Mr. Williams testified that he wrote letters on Petitioner's behalf, and he also heard that trial counsel and the trial court were having ex

parte conversations about Petitioner's case. Mr. Williams testified that Petitioner filed motions to have trial counsel, appellate counsel, and the trial judge disqualified; however, the motions were denied.

Trial counsel testified that Petitioner listened to Mr. Williams rather than trial counsel. He said that Mr. Williams "filed complaints, filed stuff with the Court, filed stuff to the Obama administration." He also said that Mr. Williams was such an "interference" in the case that trial counsel eventually withdrew from representing Petitioner on January 3, 2010, before the motion for new trial was filed. Trial counsel noted that Petitioner gave his second statement to police based on Mr. Williams' advice.

At the post-conviction hearing, Petitioner testified that he was aware of some issues between trial counsel and Petitioner's stepfather, and he discussed the matter with trial counsel. Petitioner testified that he also filed a motion to disqualify trial counsel. At the hearing on the motion, Petitioner said that the trial counsel told him "that if I wanted to get somebody else then more than likely they're not going to help me like he could and that I would probably end up with life; so I decided to keep him." Petitioner admitted that he told the court at the recusal hearing that he and trial counsel had worked things out and could get along.

Petitioner is not entitled to relief on this claim. The transcript of the recusal hearing was not included in the record on appeal nor is there any letter that Mr. Williams allegedly sent to the trial court in Petitioner's case. Although there appears to have been some disagreements between trial counsel and Petitioner, the record does not demonstrate an actual conflict of interest. There is no proof that trial counsel was unable to exercise his independent professional judgment. As pointed out by the State, trial counsel "continued to exercise his professional judgment *despite* interference from the [Petitioner's] step-father; in other words, counsel's continued exercise of his professional judgment was the source of friction between him and the [Petitioner]."

## VII.    *Ineffective Assistance of Appellate Counsel*

A defendant has a right to effective representation both at trial and on direct appeal. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995)(citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel under the *Strickland* standard set forth above. *Id.* That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id.* at 597; *see also Carpenter v. State*, 126 S.W.3d 879, 886-88 (Tenn. 2004).

A. *Failure to Include a Copy of the Suppression Hearing Transcript in the Record on Appeal*

Petitioner argues that appellate counsel rendered deficient performance by failing to include a transcript of the suppression hearing in the record on appeal. Concerning this issue, the post-conviction court found:

> In the subject amended petition, the petitioner alleges that appellate counsel was ineffective in not including the transcript of the suppression hearing in the appellate record. Although the appellate court found that the suppression issue had been waived, it also found that, although there was "little information in the record regarding the issues underlying the appellants motion to suppress other than the trial court's order denying the motion," it appeared that "the trial court correctly denied" the motion to suppress.
>
> \*       \*       \*
>
> Nothing in the transcript of the 8 August 2010 suppression hearing changes the facts supporting the appellate court's analysis of the suppression issue. The Court therefore finds that any deficiency in counsel's performance in this respect was not prejudicial.

We agree with the post-conviction court that Petitioner has not demonstrated any prejudice by appellate counsel's failure to include the transcript of the suppression hearing on appeal. We note that this court on direct appeal specifically held:

> Appellant also takes issue with the inconsistency between Cordarious Holloway's trial testimony and pretrial statements to the police. At trial, Cordarious Holloway denied any knowledge of a burglary, contrary to Detective Holloway's testimony at the motion hearing. However, whether the police had probable cause is determined by their knowledge *at the time of arrest,* and nothing in the record preponderates against the trial court's finding that Cordarious Holloway indicated to the police prior to appellant's arrest that he was aware of the burglary plan.
>
> Based on the limited record before this court, we conclude that the trial court did not err by denying appellant's suppression motion. Detective Holloway testified at trial and at the motion hearing that information from Cordarious Holloway led the police to Trammel Poindexter, who named appellant as the shooter when, unbeknownst to him, the police were recording his conversation. The police had credible information from criminal informants with personal knowledge of appellant's participation

- 25 -

in the burglary that led to the victim's death; therefore, the police had probable cause to arrest appellant. Appellant is without relief as to this issue.

*Grasty*, 2013 WL 1458660, at \*7.  Petitioner is not entitled to relief on this issue.

B.  *Failure to Raise Sufficiency of the Evidence as an Issue on Appeal*

Petitioner argues that appellate counsel was ineffective for failing to raise sufficiency of the evidence concerning his felony murder conviction.  Concerning this issue, the post-conviction court held:

> In the subject amended petition, the petitioner alleges that appellate counsel was ineffective in not challenging the sufficiency of the evidence.  The sufficiency of the evidence, however, was an issue at the hearing for the new trial.  There being no apparent reason for the Court to reach a different conclusion on the same issue now, the Court again finds that the evidence was sufficient.
>
> The only dispute at trial was identity.  In his first statement to police, the petitioner gave several versions of events before confessing to having shot the victim during a burglary and providing details about the burglars' vehicle, the target, the weapon, a black backpack, and his companions.  *Grasty*, 2013 WL 1458660 at \*3 (describing contents of first statement).  From other proof, including DNA proof from the backpack, it is evidence that the details were accurate.  In his second statement to police, the petitioner retracted his confession, indicating that one of his companions, the one that he had described as kicking in the back door, had asked him to "take the charge" but that, other gang members not supporting him after his arrest, he was unwilling to do so. Id. at \*4.  DNA evidence, however, excludes that companion and another who was not present for the burglary as contributors to the DNA on the backpack.  *Id*. The Court finds that any deficiency in counsel's performance in this respect was not prejudicial.

We find that appellate counsel's performance concerning this issue was not deficient nor has Petitioner shown that he was prejudiced by any alleged deficiency in appellate counsel's performance.  Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on

appeal and focusing on one central issue if possible, or at most a few key issues. The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell*, 904 S.W.2d at 596-97).

When a petitioner alleges that appellate counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Id.* "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887–88. Appellate counsel testified that sufficiency of the evidence was raised in the motion for new trial. However, she did not raise the issue in the appellate brief. Appellate counsel testified that it was her practice to review every issue raised in the motion for new trial and then "hone" the issues down to those that she thought might entitle Petitioner to relief. Petitioner has not demonstrated that the evidence was insufficient to support his convictions, and we will not "second-guess" appellate counsel's decision not to raise sufficiency of the evidence as an issue on appeal.

*VIII.   Cumulative Effect of Errors.*

Finally, Petitioner contends that he is entitled to cumulative error relief. However, Petitioner has failed to show that he was prejudiced by the cumulative effect of any alleged deficient performance by either trial or appellate counsel. Therefore, his claim must fail, and he is not entitled to relief on this basis. *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *Marvin Davis v. State*, No. W2015-02129-CCA-R3-PC, 2016 WL 6791078, at *8 (Tenn. Crim. App. Nov. 16, 2016).

_____
THOMAS T. WOODALL, PRESIDING JUDGE